90 A.3d 699

**GREENWOOD GAMING AND ENTERTAINMENT, INC., Appellant**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF REVENUE, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 15, 2013.

Decided April 28, 2014.

Kyle Jarrett Meyer, Esq., Alan C. Kohler, Esq., Mark Scott Stewart, Esq., Eckert Seamans Cherin & Mellott, LLC, Harrisburg, Kevin James McKeon, Esq., Hawke McKeon & Sniscak, LLP, Harrisburg, for Greenwood Gaming and Entertainment, Inc.

Howard Greeley Hopkirk, Esq., Kathleen Granahan Kane, Esq., John G. Knorr III, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania Department of Revenue.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice BAER.

In this case involving calculation of slot machine tax, Greenwood Gaming and Entertainment ("Greenwood") appeals as of right from the Commonwealth Court's *en banc* decision overruling exceptions and affirming a panel decision of that court, which likewise affirmed the order of the Board of Finance and

Review. 42 Pa.C.S. § 723(b).[1] Greenwood asks this Court to reverse the decision below and hold that the relevant section of the Gaming Act, 4 Pa.C.S. §§ 1101–1904, allows for the cost of promotional awards given away by the gaming facility to be subtracted prior to calculation of the "gross terminal revenue" for purposes of slot machine taxes. 4 Pa.C.S. § 1103 (Gross Terminal Revenue). After review, we reverse the order of the Commonwealth Court and remand for further proceedings.

Greenwood operates slot machines at the Parx Casino (formerly Philadelphia Park Casino and Racetrack) in Bensalem, Pennsylvania. It is seeking a tax credit against the slot machine tax due and paid for years 2007 and 2008 for approximately $1.1 million in cash and non-cash awards given away as promotions. The promotional giveaways included vehicles, concert tickets, sporting event tickets, and gift cards, and thus were not a result of "winning" a slot machine game, as could be dramatized by coins spilling out when the spinning reels stop on three of a kind. The slot machine tax is based upon the gross terminal revenue ("GTR").[2] During the relevant time period of 2007 and 2008, GTR was defined as the total of the "wagers received by a slot machine" minus specified reductions:

> "Gross terminal revenue." The total of cash or cash equivalent wagers received by a slot machine minus the total of:
>
> (1) Cash or cash equivalents paid out to patrons as a result of playing a slot machine which are paid to patrons either manually or paid out by the slot machine.
>
> (2) Cash paid to purchase annuities to fund prizes payable to patrons over a period of time as a result of playing a slot machine.

1. 42 Pa.C.S. § 723(b) provides, "Any final order of the Commonwealth Court entered in any appeal from a decision of the Board of Finance and Revenue shall be appealable to the Supreme Court, as of right, under this section."

2. The parties and the tribunals appear to assume that the tax is calculated at a combined rate of 55% of the "gross terminal revenue." Section 1403 provides for a "slot machine tax" of 34%, but also includes various local assessments. 4 Pa.C.S. § 1403. As there is no dispute regarding the tax percentage, this Court need not delve into this detail.

(3) Any personal property distributed to a patron as the result of playing a slot machine. This does not include travel expenses, food, refreshments, lodging or services. The term does not include counterfeit money or tokens, coins or currency of other countries which are received in slot machines, except to the extent that they are readily convertible to United States currency, cash taken in fraudulent acts perpetrated against a slot machine licensee for which the licensee is not reimbursed or cash received as entry fees for contests or tournaments in which the patrons compete for prizes.

4 Pa.C.S. § 1103 (GTR) (effective prior to Jan. 7, 2010).[3]

The Department of Revenue utilizes the "central control computer system" ("CCS"),[4] to calculate the daily slot machine

3. Effective in January 2010, the legislature amended the definition of GTR. As noted by the parties at oral argument, the Commonwealth Court and both parties in their briefs to this Court utilized the amended statute, which, for purposes of this case, is not substantially different from the prior version applicable to the case at bar. Nonetheless, we observe that the prior version provided for the subtraction of "[a]ny personal property distributed to a patron as *the* result of playing a slot machine" whereas the amended statute allows for the deduction of personal property distributed as "a" result of playing a slot machine. 4 Pa.C.S. § 1103 (emphasis added). In full, the amended statute defines GTR as follows:

"Gross terminal revenue." The total of:
(1) cash or cash equivalent wagers received by a slot machine minus the total of:
(i) Cash or cash equivalents paid out to players as a result of playing a slot machine, whether paid manually or paid out by the slot machine.
(ii) Cash or cash equivalents paid to purchase annuities to fund prizes payable to players over a period of time as a result of playing a slot machine.
(iii) Any personal property distributed to a player as a result of playing a slot machine. This does not include travel expenses, food, refreshments, lodging or services.
(2) cash received as entry fees for slot machine contests or slot machine tournaments.
The term does not include counterfeit cash or tokens; coins or currency of other countries received in slot machines, except to the extent that the coins or currency are readily convertible to cash; or cash taken in a fraudulent act perpetrated against a slot machine licensee for which the licensee is not reimbursed.

4 Pa.C.S. § 1103 (GTR).

4. In relevant part, "Central control computer system" is described as follows:

tax. The Board of Finance and Review described the process as follows: "Each day, the Department determines Petitioner's gross terminal revenue, taxes and other assessments based on actual calculations by the central control computer system. The Department notifies Petitioner of the amounts due and transfers such amounts from Petitioner's revenues to various Gaming Act funds." Board of Finance and Review Opinion, Oct. 23, 2009, at 1–2. While the CCS tracks various financial events on each slot machine including wagers and payouts, it is not technologically capable of accounting for the promotional giveaways at issue in this case.

In February 2009, Greenwood filed an appeal with the Department of Revenue's Board of Appeals, seeking a tax credit of approximately $600,000.[5] The crux of Greenwood's argument was that these awards were distributed "as a result of playing a slot machine" such that they could be subtracted from the total wagers received in determining GTR for purposes of calculating the slot machine tax. 4 Pa.C.S. § 1103(GTR)(1)-(3). The Board of Appeals rejected Greenwood's claim, finding that the promotional awards "were distributed to winners drawn from a pool of players, and not the direct result of a metered win of playing a slot machine." Decision of Bd. of Appeals, July 13, 2009, at 4. Therefore, the Board of Appeals concluded that the promotional giveaways could not be subtracted from the total wagers pursuant to the GTR calculation. Greenwood appealed to the Board of Finance and Review, asserting that the Board of Appeals erro-

(a) General rule.—To facilitate the auditing and security programs critical to the integrity of slot machine gaming in this Commonwealth, the department shall have overall control of slot machines, and all slot machine terminals shall be linked, at an appropriate time to be determined by the department, to a central control computer under the control of the department and accessible by the board to provide auditing program capacity and individual terminal information as approved by the department and shall include real-time information retrieval and terminal activation and disabling programs....

4 Pa.C.S. § 1323(a); *see also* 4 Pa.C.S. § 1103 (defining "[c]entral control computer").

5. The $600,000 credit is calculated as 55% (the tax rate on GTR) of the $1.1 million of the awards given to patrons of the gaming facility.

neously interpreted the GTR statute to require that the payouts be "a direct result of a metered win of playing a slot machine." *Id.*

The Board of Finance and Review similarly denied Greenwood relief. While Greenwood's interpretation essentially allowed credit for awards paid as a result of playing "any" slot machine, the Board concluded that that interpretation was flawed because the "Legislature did not intend to allow gross terminal revenue deductions untied to a specific machine." Decision of Bd. of Fin. and Rev., Oct. 21, 2009, at 6. The Board further concluded that awards could not be subtracted from total wagers unless they were trackable by the CCS: "Providing trackable and verifiable receipt and payout data tied to a specific machine is consistent with the Legislative intent to protect the public, police gaming activities and maintain the integrity of regulatory control over the operation of slot machines in Pennsylvania." *Id.* (citing 4 Pa.C.S. § 1102(1) which provides that a primary objective of the Gaming Act is "to protect the public through the regulation and policing of all activities involving gaming"). Because the promotional awards could not be tracked by the CCS through the individual slot machines, the Board denied Greenwood relief.

Greenwood appealed to the Commonwealth Court, and the parties submitted a stipulation of facts which detailed all the 2007 and 2008 promotional awards ("Stipulation"). Initially, a three judge panel of the Commonwealth Court affirmed the decisions below. *Greenwood Gaming and Entertainment, Inc. v. Commonwealth,* 29 A.3d 1215 (Pa.Cmwlth.2011). After Greenwood filed exceptions, the Commonwealth Court, *en banc,* adopted the panel decision without additional analysis.[6] *Greenwood Gaming and Entertainment, Inc. v. Commonwealth,* 45 A.3d 455 (Pa.Cmwlth.2012). Accordingly, our review is of the reasoning of the original panel decision.

The Commonwealth Court stated that the Gaming Act provides for the subtraction [7] of the three categories of awards

---

**6.** Judge Brobson concurred in the result of the *en banc* opinion.

**7.** The Commonwealth Court used the term deduction to refer to the items being subtracted from the total wagers to calculate GTR. As our

set forth in the GTR definition, specifically "cash or cash equivalents paid out to patrons, cash paid to purchase annuities to fund prizes, and any personal property," but the court controversially found that all three categories of awards were measured by the CCS. *Greenwood Gaming*, 29 A.3d at 1217. In regard to the CCS, the court observed that the Gaming Act requires "that each slot machine directly provides or communicates all required activities and financial details to the central control computer." 4 Pa.C.S. § 1322(b)(3). The court also noted that Section 1322(b)(6) requires that a gaming facility "[e]nsure that any financial event that occurs in the operation of a slot machine is recorded adequately to permit proper and timely reporting of gross revenue and the calculation thereof and of fees and taxes and to maintain accountability for assets." *Greenwood Gaming*, 29 A.3d at 1219 (quoting 4 Pa.C.S. § 1322(b)(6)).

The court emphasized that the awards Greenwood sought to subtract were not measured by the CCS, finding that the CCS only recorded payments "made within the algorithm of the slot machine, which results from a patron's physical operation of the slot machine." *Id.* at 1217. It further defined the phrase "within the algorithm of the slot machine" as referring to "a computer-established payout formula and methodology which provides awards to players as a result of physically operating a slot machine." *Id.* at 1217 n. 3.

To determine whether the promotional giveaways could be subtracted from total wagers under the GTR definition, the Commonwealth Court considered the phrase "as a result of playing a slot machine" and concluded that it was ambiguous, a determination which both parties now contest on appeal. To resolve the ambiguity, the court looked to the definition of a "slot machine," which it viewed as tied to the physical operation of the apparatus.[8] *Id.* at 1219. It concluded that the

resolution of this case turns on whether subsections (1)-(3) are exclusions, which are interpreted in favor of Greenwood, or exemptions which are interpreted in favor of the Commonwealth, we prefer to use the more neutral term "subtraction" to the extent possible.

8. Slot machine is defined as follows:

phrase, "as a result of playing a slot machine," should therefore be interpreted to mean "as a direct and immediate result of physically operating a slot machine." *Id.* at 1220.

It further opined that "[t]he actual winning of a prize from the physical operation of a slot machine would be recorded by the CCS regardless of how the prize was actually distributed," which would encompass the "personal property" provision in subsection (3) of the GTR definition. *Id.* at 1219. In contrast to winnings directly resulting from the physical operation of a slot machine, the majority concluded that the promotional awards in this case were awarded to patrons who merely had Players Cards,[9] and thus, were not tracked by the CCS, nor

> Any mechanical, electrical or computerized contrivance, terminal, machine or other device approved by the Pennsylvania Gaming Control Board which, upon insertion of a coin, bill, ticket, token or similar object therein or upon payment of any consideration whatsoever, including the use of any electronic payment system except a credit card or debit card, is available to play or operate, the play or operation of which, whether by reason of skill or application of the element of chance or both, may deliver or entitle the person or persons playing or operating the contrivance, terminal, machine or other device to receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever, whether the payoff is made automatically from the machine or manually. A slot machine: debit card, is available to play or operate, the play or operation of which, whether by reason of skill or application of the element of chance or both, may deliver or entitle the person or persons playing or operating the contrivance, terminal, machine or other device to receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever, whether the payoff is made automatically from the machine or manually. A slot machine:
> (1) May utilize spinning reels or video displays or both.
> (2) May or may not dispense coins, tickets or tokens to winning patrons.
> (3) May use an electronic credit system for receiving wagers and making payouts.
> The term shall include associated equipment necessary to conduct the operation of the contrivance, terminal, machine or other device.
> 4 Pa.C.S. § 1103 (slot machine) (effective Jan. 7, 2010). Although this section was amended in January 2010, the amendments are not relevant to the issues at bar.

9. Players Cards "look like credit or debit cards" and are provided to patrons who sign up for the cards. Stipulation at 3, ¶ 15. "The Players

necessarily awarded "as a result of playing a slot machine." *Id.* at 1220. Rather than being tied directly to the physical operation of a slot machine, the promotions were awarded, for example, to patrons who had their Players Card inserted into a slot machine at a designated time or who presented a postcard at a specific time, where the postcard was sent as a result of their past slot machine usage. Concluding that Greenwood's promotional awards resulted not from "playing a slot machine" but from having a Players Card and that the awards were not measurable with the CCS, the court held that the awards could not be subtracted from total wagers in determining GTR.

Judge Simpson dissented. Like the majority, he concluded that the language "as a result of playing a slot machine" is ambiguous. However, the dissent noted that when construing an ambiguity in a taxing statute, the conflict must be resolved in favor of the taxpayer, pursuant to Pennsylvania's Rules of Statutory Construction, 1 Pa.C.S. § 1928(b)(3). The dissent emphasized that the panel majority did not address Section 1928(b)(3), even though Greenwood had proffered this argument.

Additionally, the dissent noted that the definition of GTR contemplated the subtraction of values not accounted for by the CCS, specifically cash or cash equivalents "paid manually" and for non-cash personal property awards. 4 Pa.C.S. § 1103(GTR)(1). The dissent concluded, "The existence of express deductions for these distributions renders the statute ambiguous. Their existence also supports the reasonable interpretation urged by the Taxpayer." *Greenwood Gaming,* 29 A.3d at 1220–1221 (Simpson, J., dissenting).

Greenwood appeals raising the following issue:

Are cash and non-cash awards paid out and distributed to casino patrons as promotions based on a patron's slot machine activity, but paid outside the payout algorithms of a

Cards identify the patron to the casino's computer system, which stores data on the patron, including his/her complete gaming activity." *Id.*

slot machine, properly deductible from taxable "gross terminal revenue" as defined in 4 Pa.C.S. § 1103?

Greenwood Brief at 4.

Greenwood urges this Court to reverse the Commonwealth Court's holding that the only payments that may be subtracted from the taxable GTR are those made pursuant to the payout algorithms of the slot machines and measured by the CCS. Instead, Greenwood argues that the plain language of the statute's definition of GTR allows subtraction of cash or cash equivalents, annuity payments, or personal property paid or distributed to patrons, with the only limitation being that the awards are "as a result of playing a slot machine." 4 Pa.C.S. § 1103(GTR)(1)-(3). It argues that the awards in this case fall within the statute's requirements.

Initially, Greenwood argues that the awards in this case may be subtracted under the plain language of the definition of GTR because they were distributed "as a result of playing a slot machine." *Id.* Greenwood contends that there is a "direct, discernible nexus between the qualifying slot machine play and the award." Greenwood Brief at 8. Greenwood explains that all the awards at issue were distributed to patrons who held Players Cards. The Players Cards, which are classified as Regular, Premium, and Elite, are akin to customer loyalty cards and track patrons' gaming activity. It argues that the Players Cards are a "reliable proxy for prior slot machine play." Greenwood Brief at 16.

Greenwood categorizes the method of awarding prizes into four groups: (1) "from among patrons who had their Players Cards inserted into a slot machine during a designated period or at a designated time;" (2) "from among entries deposited in and selected from a drawing drum or by a computer using a random number generator;" where entries were based on prior slot machine play, (3) "by bringing to a specific place at the casino ... a postcard or other mailer the casino had sent to a patron;" or (4) other awards provided "directly to a specific patron as part of 'Player Development.'" Greenwood Brief at 8–9, quoting Stipulation at 5 ¶ 26. Greenwood distrib-

uted the postcard and player development awards using prior gaming activity as eligibility criteria, with higher value promotions awarded to the higher tiers of Players Card holders. Greenwood argues that each of these award categories has a palpable connection to slot machine play such that each category satisfies the plain language of Section 1103's provision allowing for the subtraction of "[c]ash or cash equivalents paid out to players as a result of playing a slot machine" or "personal property distributed to a player as the result of playing a slot machine." 4 Pa.C.S. § 1103 (GTR)(1–3).

Next, Greenwood criticizes the Commonwealth Court's requirement that all awards be recordable by the CCS in order to be subtracted from total wagers pursuant to Section 1103's calculation of GTR. Greenwood acknowledges that the Gaming Act provides for the CCS to track various financial data, including payouts made pursuant to the algorithm of the slot machine. It emphasizes, however, that the Gaming Act does not require that GTR be based on CCS data or reference the CCS in the definition of GTR.

In a footnote, Greenwood confronts the Commonwealth Court's suggestion that awards not tracked by the CCS are unmonitored transactions that cannot be audited. Greenwood Brief at 20 n.11. It asserts that the transactions will still be monitored even if not specifically tracked by the CCS since the taxpayer must file a petition for a refund supported by documentation. Greenwood further emphasizes that nothing in the Gaming Act provides that the CCS is the only method for monitoring and accounting for slot machines. Greenwood acknowledges that subsection (3) of Section 1322(b)'s minimum requirements for slot machine accounting controls requires that each slot machine directly communicate all required financial details to the CCS. However, Greenwood observes that several other subsections addressing financial reporting do not mention the CCS, thus suggesting that not all reporting must be processed through the CCS but could instead be provided by supporting documentation for a refund, as in this case. 4 Pa.C.S. § 1322(b).

Assuming *arguendo* we hold that the language is not plain, Greenwood alternatively argues that, if the GTR definition is ambiguous, the promotional awards at issue still fit within the statutory language based on our rules of statutory construction. Greenwood emphasizes that any ambiguity in provisions imposing a tax must be construed in favor of the taxpayer and against the taxing authority. *See* 1 Pa.C.S. § 1928(b)(3) ("[p]rovisions imposing taxes"). Greenwood acknowledges that exemptions from taxation are strictly construed against the taxpayer under 1 Pa.C.S. § 1928(b)(5) ("[p]rovisions exempting persons and property from taxation"). Greenwood, however, asserts that the provisions at issue do not constitute exemptions, but rather exclusions, because the language defines the property upon which taxes are imposed, citing *BFC Hardwoods, Inc. v. Bd. of Assessment Appeals of Crawford Co.*, 565 Pa. 65, 771 A.2d 759, 763 n. 5 (2001) (observing that exemptions are strictly construed in favor of taxation whereas "doubts are resolved in favor of the taxpayer in assessing the reach of the taxing statute in the first instance."). *See also; Lehigh–Northampton Airport Auth. v. Lehigh Co. Bd. of Assessment Appeals*, 585 Pa. 657, 889 A.2d 1168, 1177–78 (2005). Accordingly, Greenwood argues that any ambiguity in these exemptions should be construed in its favor as the taxpayer.

Greenwood also asserts an argument regarding the so-called "comp exclusion." As noted, the definition of GTR allows for the subtraction of "[a]ny personal property distributed to a player as the result of playing a slot machine" but provides that "[t]his does not include travel expenses, food, refreshments, lodging or services," colloquially known as "comps." 4 Pa.C.S. § 1103(GTR)(3). Emphasizing that courts must construe statutes to give effect to all provisions, 1 Pa.C.S. § 1921, 1922, Greenwood contends that the comp exclusion would be superfluous if items not traceable via the CCS could not be subtracted from total wagers because comps are also not traceable by the CCS. Greenwood emphasizes that comps function in a similar way to the awards at issue in this case which are given to selected patrons to encourage their contin-

ued gaming and not as a result of winning a specific slot machine game. Thus, Greenwood contends that the "comp exclusion" implies that items may be included in subsection (3) "personal property" even if they cannot be measured by the CCS.

Additionally, Greenwood discusses the exclusion of comp items from the personal property category in regard to the maxim *expressio unius est exclusio alterius:* the express inclusion of one thing implies the exclusion of another. It contends that the personal property awards at issue in this case, such as concert tickets, cars, jewelry, and gift certificates, are indistinguishable from the specified types of comp awards (travel, food, lodging). Greenwood asserts, "Applying that maxim here, the legislature's express exclusion of comps from the personal property deduction signals the availability of the deduction for all other forms of personal property not expressly excluded, including the non-cash awards at issue." Greenwood Brief at 25.

Greenwood further asserts that the Commonwealth Court improperly relied upon the Department's regulation regarding State Gaming Fund Transfers. The relevant subsection provides:

> Determinations of gross terminal revenue and the calculations of taxes and other assessments due will be determined by the Department based on the actual calculations by the CCS and the certificate holders' weekly reports of table game revenue made to the Department.

61 Pa.Code § 1001.8(c)(1). Greenwood contends that this regulation merely establishes a mechanism for measuring and paying daily taxes and does not purport to forbid other methods of measuring GTR. Moreover, it argues that even if the regulation did apply as the Commonwealth Court interpreted, it would be invalid as contrary to the statutory language, which Greenwood views as allowing the reductions not accounted for by the CCS.

Given the preceding arguments, Greenwood asks the Court to overturn the decisions below and allow for the subtraction of the promotional awards from the calculation of GTR.

While agreeing with Greenwood that the result is dictated by the plain language, and not ambiguous as the Commonwealth Court held, the Commonwealth asserts that the plain language of GTR definition only allows for the subtraction of those awards that are a direct result of playing a particular slot machine. It acknowledges that the language, "as a result of playing a slot machine" might be ambiguous if viewed in isolation, but contends that it is appropriate to look to legislatively defined terms, before deeming the phrase ambiguous.

Specifically, the Commonwealth focuses on the defined term "slot machine," which is referenced in the definition of GTR. As did the Commonwealth Court, the Commonwealth emphasizes a portion of the definition of slot machine:

the play or operation of which, whether by reason of skill or application of the element of chance or both, may deliver or entitle the person or persons playing or operating the contrivance, terminal, machine or other device to receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever, whether the payoff is made automatically from the machine or manually.

4 Pa.C.S. § 1103 (Slot Machine). It argues that this language indicates that the General Assembly intended that a patron "playing" a slot machine "would have [to] be engaged in the actual physical operation of a slot machine." Commonwealth Brief at 13. In contrast, it maintains that the promotional giveaways awarded to Players Card holders, who merely have a general history of playing slot machines, are not a result of physically playing a slot machine.

The Commonwealth also finds support in the statutorily mandated use of the CCS, which is intended to promote the integrity of slot machine gaming through an auditing and security program. It claims that the CCS is the only mechanism under the Gaming Act for determining GTR for purposes

of imposing tax. As did the Commonwealth Court, the Commonwealth contends that the security purposes of the CCS would be undermined by allowing gaming facilities to subtract awards that are not monitored by the CCS.

Assuming *arguendo* that the language is not plain, the Commonwealth maintains that its interpretation of the GTR definition is consistent with the underlying purpose of the section, which is to tax the net revenue generated by slot machines. It argues that the promotional awards at issue are unrelated to the calculation of slot machine revenue. In contrast, the Commonwealth asserts that standard slot machine winnings are clearly relevant to the calculation of the net revenue, as one must subtract winnings from the total wagers to determine revenue:

> While it makes perfect sense to deduct the cost of prizes which are awarded as a part of, and as a result of, playing slot machines from the total revenue taxed, it does not make sense to deduct the cost of promotional prizes where the "winners" of those prizes did not make any wagers at slot machines (i.e. directly contribute to gross terminal revenue) "in order to receive any of those prizes".

Commonwealth Brief at 16. The Commonwealth argues that "[i]t makes no more sense to deduct the cost of these promotional prizes from the income generated by slot machines than it would to deduct the same costs from income generated by a casino's restaurants, parking garage, or other commercial enterprises." Commonwealth Brief at 16. It asserts that the costs of the promotional awards are more properly deductible from the calculation of corporate income tax as reasonable business expenses.

Next, the Commonwealth argues that, because the General Assembly provided for the Department of Revenue to calculate the tax due each day based upon the information it receives from the CCS and did not provide another method for tracking the promotional awards, these awards should not be subtracted from the total wagers. Moreover, it contends that the Department is barred by statute from having access to the information on the Players Cards, which are used for the

promotional awards, and is therefore unable to monitor these promotional awards.[10] It maintains that allowing for the subtraction of the promotional awards "would be contrary to the basic underlying intent of the Legislature in establishing strict controls over the operation of slot machine gambling in Pennsylvania," noting that many of the strict controls are rooted in the CCS. Commonwealth Brief at 18. It avers that even if the definition of GTR "could be interpreted as a matter of semantics" to include promotional awards, it "would be entirely inconsistent with the system of strict regulation and accountability intended by the Legislature." Commonwealth Brief at 18–19.

In response to Greenwood's argument that the Commonwealth Court erred in failing to interpret any ambiguity in favor of the taxpayer, the Commonwealth avers that this case does not fall under the general rule for construing tax provisions. *See* 1 Pa.C.S. § 1928(b)(3), (5). Instead, the Commonwealth contends that the case involves "the challenge to the denial of a deduction rather than the denial of an exemption or exclusion from being subject to a tax in the first place." Commonwealth Brief at 20. It asserts that Greenwood has the burden of proof when seeking a refund due to the improper denial of a deduction, citing *Tool Sales and Service Co., Inc. v. Commonwealth,* 536 Pa. 10, 637 A.2d 607, 613 (1993) (quoting 72 P.S. § 7236 as providing, "In all cases of petitions for reassessment, review or repeal, the burden of proof shall be upon petitioner or appellant as the case may be.").

**10.** In support, the Commonwealth cites provisions of the definition of the CCS,:

> (a) General Rule.... The central control computer employed by the department shall provide:.... (4) The delivery of a system that allows the slot machine licensee to install independent player tracking systems and cashless technology as approved by the board.
>
> $*$    $*$    $*$
>
> (b) Personal information.-Except as provided for in subsection (a)(4), the central control computer shall not provide for the monitoring or reading of personal or financial information concerning a patron of a slot machine licensee.

4 Pa.C.S. § 1323(a)(4), (b).

As noted in Greenwood's argument, the Commonwealth also claims that this Court should afford deference to the regulations adopted by the Department of Revenue which provide, "[d]eterminations of gross terminal revenue and the calculations of taxes and other assessments due will be determined by the Department based on the actual calculations by the CCS." 61 Pa.Code § 1001.8(c)(1). It argues that this regulation is consistent with the statutory definition of GTR regardless of whether this Court concludes that the definitional language is plain or ambiguous. If it is determined to be ambiguous, the Commonwealth contends that we should give deference to the Department of Revenue's interpretation as the agency with substantial expertise in the area. Arguing that the regulation is not clearly erroneous, the Commonwealth asserts that we cannot declare it invalid.

Responding to Greenwoods' argument regarding the comp exclusion, the Commonwealth asserts that this argument is a "red herring." It contends, "The specific disallowance of certain items from deductible property, though, simply does not expand the meaning or scope of the deduction itself." Commonwealth Brief at 22. It maintains that the central question remains whether the awards are "a result of playing a slot machine." Commonwealth Brief at 22. The Commonwealth further argues that Greenwood's interpretation is absurd because it would allow the deduction of a promotional award merely because the Players Card holder had at one time played a slot machine. It avers that such an award could not be deemed to be "as a result of playing a slot machine." 4 Pa.C.S. § 1103 ("GTR"). For all these reasons, the Commonwealth urges the Court to affirm the decisions below holding that the promotional giveaways cannot be deducted from the calculation of GTR.

■ In this case, we interpret the statutory language defining the gross terminal revenue for purposes of calculating the slot machine tax. As with any question of statutory interpretation, our standard of review is de novo, and our scope of review is plenary. *Mercury Trucking, Inc. v. Pa. Pub. Util. Comm'n*, 618 Pa. 175, 55 A.3d 1056, 1067 (2012). In interpret-

ing a statute, our primary goal is "to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921. "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* Additionally, we construe every statute "if possible, to give effect to all its provisions." *Id.; see also* 1 Pa.C.S. § 1922 ("the General Assembly intends the entire statute to be effective and certain").

Specific interpretive rules apply to statutes relating to taxation instructing that courts must construe strictly "provisions imposing taxes" and "provisions exempting persons and property from taxation." 1 Pa.C.S. § 1928. Somewhat counterintuitively, these two strict construction rules create opposite forces depending on the categorization of the tax provision. On the one hand, provisions that impose taxes are strictly construed in favor of the taxpayer and against the taxing authority. Accordingly, provisions defining what property is subject to the tax, as opposed to what property is "excluded," are interpreted strictly in favor of the taxpayer. *See Crawford Cent. Sch. Dist. v. Com.,* 585 Pa. 131, 888 A.2d 616, 620 (2005) ("'Exclusions' are given for tax paid on items not intended to be taxed in the first place."); *BFC Hardwoods, Inc.,* 771 A.2d at 763 n. 5 (observing in regard to exclusions, "doubts are resolved in favor of the taxpayer in assessing the reach of the taxing statute in the first instance"). Conversely, statutes creating "exemptions" from taxes are construed in favor of the taxing authority and strictly against the taxpayer. *See Crawford Cent. Sch. Dist.,* 888 A.2d at 620 ("'Exemptions' are given for the tax paid on items that, though ordinarily subject to taxation, are excused from taxation because certain criteria have been met.").

We turn first to the plain language of the statute at hand, which provides in relevant part:

"Gross terminal revenue." The total of cash or cash equivalent wagers received by a slot machine minus the total of:

(1) Cash or cash equivalents paid out to patrons as a result of playing a slot machine which are paid to patrons either manually or paid out by the slot machine.

(2) Cash paid to purchase annuities to fund prizes payable to patrons over a period of time as a result of playing a slot machine.

(3) Any personal property distributed to a patron as the result of playing a slot machine. This does not include travel expenses, food, refreshments, lodging or services.

4 Pa.C.S. § 1103 (GTR) (effective prior to Jan. 7, 2010).

Neither party disputes that the plain language of the statute only allows for awards to be subtracted from total wagers in determining GTR if they are "a [or the] result of playing a slot machine." *Id.* The parties' interpretations, however, differ regarding what "a result of playing a slot machine" means. The lower tribunals, in essence, interpreted this language to require that the awards be a result of "winning" a slot machine game as the tribunals either required that the awards be a "direct result of a metered win" or, similarly, that the awards be within the algorithm of a specific slot machine tracked by the CCS. Decision of Bd. of Appeals, July 13, 2009, at 4; Decision of Bd. of Fin. and Rev., Oct. 29, 2013, at 6; *Greenwood Gaming*, 29 A.3d at 1219. We initially reject, under the plain language of the statute, any requirement that the awards be tied to "winning," by which we mean the process of a patron physically operating a slot machine and the machine registering that the patron has become eligible for a payout pursuant to the algorithm of that machine. In layman's terms, we do not view the phrase "as a result of playing" as being restricted to the prototypical image of coins spilling out of a machine when the spinning reels stop on three of a kind.

We find unpersuasive the Commonwealth Court's reliance on the definition of "slot machine" as indicative of the need for awards to be tied to the algorithm of the machine. The flaw in the analysis is that the definition of GTR uses the term "playing" not "winning" a slot machine. It is beyond cavil

that the Legislature understood the difference between playing and winning when it enacted the Gaming Act. *See, e.g.,* 4 Pa.C.S. § 1207(10) (dictating that the theoretical *payout* percentage of each slot machine must be no less than 85%). Indeed, the definition of "slot machine," that serves as the linchpin of the Commonwealth Court's analysis, provides that "the play or operation" of the slot machine "may" entitle the player to receive cash or merchandise. 4 Pa.C.S. § 1103 (slot machine). The corollary is that "playing" a slot machine, as used in both the definitions of GTR and slot machine, does not necessarily result in winning under the algorithm of the slot machine. We believe that if the Legislature intended the definition of GTR to allow only for the subtraction of payouts for winning a slot machine game, it would have used such specific terminology. Therefore, based on plain language, we reject the Commonwealth Court's conclusion to the extent it can be read to require a "win" on the slot machine.[11]

■ To the extent that the Commonwealth's argument can be limited to requiring that the awards be tracked by the CCS, we also find nothing in the Gaming Act or the regulations cited by the Commonwealth to support this interpretation. We initially observe that the definition of GTR does not reference the CCS, even though GTR and the CCS are both defined in Section 1103. Moreover, while the Gaming Act requires all slot machines to be linked to the CCS "[t]o facilitate the auditing and security programs critical to the integrity of slot machine gaming in this Commonwealth," 4 Pa.C.S. § 1323(a), nothing in that section suggests that a gaming facility cannot maintain other relevant records.

Significantly, Section 1322(b)'s "minimum requirements" for "[s]lot machine accounting controls and audits" are not limited to the CCS. While the legislature in Section 1322(b)(3) mandated "that each slot machine directly provide[ ] or communi-

11. Even if this language was deemed ambiguous, we further recognize that it would be interpreted in favor of Greenwood as taxpayer, given our determination, *infra* at 713–14, that the subsections of the GTR definition set forth exclusions, which are interpreted in favor of the taxpayer, rather than exemptions.

cate[ ] all required activities and financial details to the [CCS] as set by the [Gaming Board]," other subsections contemplate additional financial records. 4 Pa.C.S. § 1322(b)(3). Specifically, Section 1322 directs gaming facilities to establish protocols that "[p]rovide for reliable records, accounts and reports of any financial event that occurs in the operation of a slot machine, including reports to the [Gaming Board] related to the slot machines;" "[p]rovide for accurate and reliable financial records"; and "[e]nsure that any financial event that occurs in the operation of a slot machine is recorded adequately to permit proper and timely reporting of gross revenue and the calculation thereof and of fees and taxes and to maintain accountability for assets." 4 Pa.C.S. § 1322(b)(2), (4), (6). These more general subsections would be unnecessary if the universe of financial reporting for slot machines was limited to the CCS. We conclude that nothing in the statutes listed requires the awards to be tracked by the CCS. Moreover, we are not concerned that the integrity of gaming in the Commonwealth will be at risk given that the gaming entities will have to file a petition for a refund documented by adequate and reliable financial records or face appropriate rejection of the petition by the Department of Revenue.

Similarly, we reject the Commonwealth's claim that we should defer to the regulation referencing GTR. Instead, our reading of the regulation relating to "State Gaming Fund Transfers," and in particular the subsection relating to "[t]ax assessments and credit against tax," does not require all items relevant to GTR to be tracked by the CCS. 61 Pa.Code § 1001.8(c)(1). Instead, the relevant language, *supra* at 707–08, merely provides that the Department's GTR determinations and related tax calculations be based on the CCS. It does not forbid the gaming entities from providing other calculations of GTR not based upon the CCS. In fact, a later subsection addresses how a gaming entity can challenge the Department's conclusions, which arguably would include the calculation of GTR. 61 Pa.Code. § 1001.8(c)(5). Accordingly, we find nothing in the statute or the Department's regulations

requiring that the amounts subtracted from total wagers in calculating GTR must be tracked solely by the CCS.[12]

■ Nonetheless, while we conclude that the plain language of the statute requires neither a metered win nor tracking by the CCS, we find the definition of GTR is still ambiguous regarding the meaning of the phrase "result of playing a slot machine." The Commonwealth convincingly asserts that the promotional awards at issue, which are arguably unrelated to any specific act of playing a specific slot machine, are likewise not related to the purpose underlying the GTR calculations. As the Commonwealth suggests, GTR measures the revenue of a slot machine, which in most simplistic terms is the wagers received minus the winnings paid out. The promotional awards, however, are not precisely correlated to the quantity of wagers received, and thus, according to the Commonwealth, should not be deducted from total wagers any more than they should be deducted as expenses related to the parking garage or the restaurants.

Conversely, Greenwood presents strong arguments that each promotional award has a nexus to a patron's slot machine play and is a direct "result of playing a slot machine," given that each award was the result of prior gaming history or of having the Players Card inserted into a slot machine at a particular time. Moreover, Greenwood observes that the comp exclusion in the personal property subsection would be redundant if the personal property subsection was already restricted to awards tied to a specific slot machine play.

Given the apparent ambiguity, we turn to our rules of statutory interpretation involving taxation. As noted, statutes that define what property is and is not subject to taxation are

12. The parties presented diametrically opposing arguments regarding whether the CCS could track the second and third categories of items in Section 1103 that can be subtracted from total wagers in determining GTR, specifically "[c]ash paid out to purchase annuities" and "personal property." 4 Pa.C.S. § 1103 (GTR). Both Greenwood and the Commonwealth cited the same paragraphs of the Stipulation in support of their arguments. As we conclude that the Gaming Act and the Department's regulations do not require tracking by the CCS, we need not determine this disputed factual question.

interpreted strictly in favor of the taxpayer and against the Commonwealth. *See* 1 Pa.C.S. § 1928(b)(3) (requiring strict construction of "[p]rovisions imposing taxes"); *see also Crawford Cent. Sch. Dist.*, 888 A.2d at 620 (" 'Exclusions' are given for tax paid on items not intended to be taxed in the first place."); *BFC Hardwoods, Inc.*, 771 A.2d at 763 (observing in regard to exclusions, "doubts are resolved in favor of the taxpayer in assessing the reach of the taxing statute in the first instance"). Greenwood is correct that the definition of GTR in Section 1103 involves defining what is and is not subject to the slot machine tax in the first instance. The section begins with total wagers and from there subtracts (1) cash paid out, (2) cash paid to purchase annuities to fund prizes, and (3) personal property distributed. 4 Pa.C.S. § 1103(GTR)(1)-(3). The result of this calculation is GTR. It is GTR, not the original total wagers, that serves as the basis for the slot machine tax. 4 Pa.C.S. § 1403 (providing that "each slot machine licensee shall pay a daily tax of 34% from its daily gross terminal revenue from the slot machines in operation at its facility and a local share assessment ...."). Thus, subsection (1)-(3) are exclusions, which must be interpreted strictly in the favor of Greenwood as the taxpayer.[13]

Therefore, any ambiguity in the phrase "as a result of playing a slot machine" should be interpreted in favor of the taxpayer, including the consideration of whether the "playing" should be tied to a specific slot machine. Accordingly, we conclude that the amounts that can be deducted from total wagers need not be tied to specific machines, but rather can be tied more generally to slot machine play at the gaming facility. We further find support for this reading in the "comp exclusion" included in subsection (3). As Greenwood argues, the comp exclusion would be an unnecessary statutory section

---

**13.** We reject the Commonwealth's suggestion that this case involves neither an exemption nor an exclusion but rather a refund. While the Commonwealth is correct that Greenwood has the burden of demonstrating its right to a refund, Greenwood is arguing for a refund based upon the applicability of statutory language. Therefore, we interpret the statutory language under our rules of statutory construction, not based on who is bringing the claim. In its brief to this Court, the Commonwealth does not offer argument that this is not an exclusion.

if the gaming facility could only subtract personal property distributed to a patron that was tied to a specific machine. Comps, such as free drinks and lodging, are not given to patrons as a result of playing a particular slot machine. Instead, they are provided as an enticement for continued slot machine gaming, just like the promotional awards in the case at bar. Thus, we conclude that the Legislature's inclusion of the comp exclusion is indicative of an intent to allow gaming facilities to subtract amounts, such as the promotional awards, without requiring these sums to be tied to the play of a specific slot machine at a specific time. *See* 1 Pa.C.S. § 1921(a) (requiring every statute to be construed to give effect to all its provisions).

Nevertheless, to be deductible, the promotional awards must result from playing slot machines, and Greenwood is obligated to prove as much. After review of the Stipulation, we conclude that questions of fact remain concerning whether the specific awards claimed are a "result of playing a slot machine." For example, in regard to the promotional awards given to patrons who had their Players Cards inserted in a slot machine at a specific time, the Stipulation does not indicate how insertion of the Players Card relates to actually "playing" the slot machine, as required by Section 1103's definition of GTR. As another illustration, the Stipulation catalogues the cost of roses given to women dining in Greenwood's restaurant on Valentine's Day and the cost of plastic eggs given at Easter which enclosed free slot play, without indicating how the items were "personal property distributed to a patron as the result of playing a slot machine," 4 Pa.C.S. § 1103(GTR)(3), as opposed to "as the result of" eating in the restaurant or walking into the casino. Stipulation at 14 ¶ 70, 15 ¶ 73. We recognize that these and other factual issues were not addressed by the parties or the tribunals below given that the debate then centered on whether the distributions had to be related to a metered win of a slot machine or tracked by the CCS.[14] Accordingly, development of a record is

14. We acknowledge that Greenwood has asserted that it would have provided a temporal nexus between the promotional awards and slot

required to determine whether each amount claimed by Greenwood was distributed as a result of a patron's slot machine play.

Accordingly, we reverse the order of the Commonwealth Court and remand for further proceedings to determine if the claimed amounts were a result of playing a slot machine as interpreted in this decision.

Justices SAYLOR, EAKIN, TODD, McCAFFERY and STEVENS join the opinion.

Chief Justice CASTILLE files a dissenting opinion.

Chief Justice CASTILLE, dissenting.

I respectfully dissent from the able Majority Opinion because I cannot agree that, in defining the phrase "gross terminal revenue" vis-à-vis slot machines, the General Assembly intended to create a loophole for casinos whereby their discretionary general marketing and promotional costs—matters over which the Commonwealth has no control—may be passed on to the taxpayers.

At the heart of this matter lies the fact that Greenwood spent $1.1 million in cash and non-cash awards-including vehicles, event tickets, and gift cards-to market and promote its business, and now seeks to offset those costs by claiming $600,000 in the form of a tax credit. As noted by the Commonwealth Court below, these awards "were designed [by Greenwood] to improve the relationship between Greenwood and its patrons, with the ultimate goal of encouraging patrons to frequent the casino more often, to increase his/her gaming activity, and to promote the casino...." *Greenwood Gaming and Entertainment, Inc. v. Commonwealth,* 29 A.3d 1215, 1217 (Pa.Cmwlth.2011). As aptly stated by the Majority here, Greenwood asks this Court to hold that Section 1103 of the Gaming Act, 4 Pa.C.S. § 1103 (Section 1103), allows for a substantial portion of such marketing and promotional costs to be credited as a pre-tax deduction from slot machine-related

machine play if that had been the focus of the inquiry in the tribunals below. Greenwood Brief at 8, n.4.

gross terminal revenue in calculating slot machine taxes due to the Commonwealth. In order to make the connection between these promotional costs and slot machine gross terminal revenue, Greenwood claims it limited these promotions to Greenwood patrons who either inserted their "Players Card" into a slot machine at some point, presented in person a postcard mailed to them by Greenwood with entries for selection by a random number generator, or simply were chosen as a specific patron targeted for "player development." *Id.* The Commonwealth Court reasonably concluded that "the prizes awarded are more accurately described as resulting from one having a Players Card, not as resulting from simply playing a slot machine." *Greenwood Gaming and Entertainment, Inc.*, 29 A.3d at 1220. Thus, as noted by the Majority here, it is—to say the least—unclear as to whether these promotional awards can be described as related to actually playing slot machines. Maj. Op. at 79, 90 A.3d at 714 ("to be deductible, the promotional awards must result from playing slot machines, and Greenwood is obligated to prove as much").

Resolving this dispute first turns upon construction of the statutory phrase "as a result of playing a slot machine," as employed in Section 1103's definition of "gross terminal revenue." Under Section 1103, gross terminal revenue is defined as the total of:

(1) cash or cash equivalent wagers received by a slot machine minus the total of:

(i) Cash or cash equivalents paid out to players as a result of playing a slot machine, whether paid manually or paid out by the slot machine.

(ii) Cash or cash equivalents paid to purchase annuities to fund prizes payable to players over a period of time as a result of playing a slot machine.

(iii) Any personal property distributed to a player as a result of playing a slot machine. This does not include travel expenses, food, refreshments, lodging or services.

(2) cash received as entry fees for slot machine contests or slot machine tournaments.

4 Pa.C.S. § 1103. In other words, gross terminal revenue, a measurement of the collective revenue generated by a casino's employment of slot machines, is a dollar figure produced by a relatively simple mathematical equation, to wit: gross terminal revenue = (cash received by a slot machine − wager related costs of slot machine operation) + (entry fees for slot machine contests/tournaments). As the Majority Opinion concedes, "[t]he Commonwealth convincingly asserts that the promotional awards at issue, which are arguably unrelated to any specific act of playing a specific slot machine, are likewise not related to the purpose underlying the [gross terminal revenue] calculations." Maj. Op. at 77, 90 A.3d at 713.

Thus, this Court is called upon to interpret the statutory definition of gross terminal revenue to determine whether marketing and promotional expenses in the form of awards and prizes should be subtracted from total wagers as the "result of playing a slot machine," for purposes of calculating taxes due to the Commonwealth on slot machine revenue, where the awards are, at best, only tangentially related to slot machines, have no impact on the wager related costs of slot machine operation, and are selectively issued, perhaps even at whim, by casinos for the sole purpose of promoting their businesses. I am not persuaded that the General Assembly intended to have the Commonwealth's taxpayers foot these expenses.

As aptly stated in this Court's Majority Opinion, all statutory taxing provisions are to be strictly construed, and provisions imposing taxes are construed in favor of the taxpayer where there is **reasonable** doubt concerning the interpretation thereof. 1 Pa.C.S. § 1928(b)(3); *Bundy v. Belin,* 501 Pa. 255, 461 A.2d 197 (1983). "Of equal importance [however,] is the presumption that the General Assembly does not intend a result that is absurd … or unreasonable." *Triumph Hosiery Mills, Inc. v. Commonwealth,* 469 Pa. 92, 364 A.2d 919, 921 (1976) (citing 1 Pa.C.S.A. § 1922(1)). As noted in the Majority Opinion, the Commonwealth argues that interpreting gross terminal revenue in such a way as to allow the deduction of a promotional award from money otherwise taxable by the

Commonwealth merely because a selected card holder had at one time played a slot machine produces an absurd result that, I believe, was not intended by the General Assembly.

In my view, the idea behind Section 1103 is that slot machine revenue consists of money gained from the operation of slot machines, minus actual **costs attributable** to operating the same. Paying out winnings, as addressed in Section 1103(1)(i) and (iii), are costs of operating slot machines. Paying for annuities to fund prizes payable over time, as addressed in Section 1103(1)(ii), is a cost of operating slot machines. Marketing and promotional awards, on the other hand, are not costs of operating slot machines, but simply a casino's costs of doing business which exist independent of slot machine revenue, and would exist even if the casino had no slot machines. Thus, I would affirm the Commonwealth Court's holding that "the allowable deductions are prizes that are won as a direct product of physical operation of a particular slot machine, not just because the patron played a slot machine at some point in time." *Greenwood Gaming and Entertainment, Inc.*, 29 A.3d at 1219. As the Commonwealth contends, it is nonsensical to deduct the costs of marketing and promotions from slot machine revenue where the recipients of the promotional "prizes" make no wagers at slot machines and, therefore, no contribution to gross terminal revenue to receive such prizes. I do not believe the General Assembly intended such an unreasonable result.

Again, marketing and promotional expenses are simply a cost of doing business, *i.e.*, business expenses, for casinos. As such these expenses are somewhat self-regulating in the sense that they eat into the casino's profits. The more promotions cost, the less profit the casino makes. It is appropriate that the casino pays for all such expenses, and not the Commonwealth. The unintended effect of the Majority Opinion will be to encourage increased casino giveaways, subsidized by the taxpayers. Because I believe this result is contrary to legislative intent, I respectfully dissent.